1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE EASTERN DISTRICT OF CALIFORNIA

7

8  LAURA A. BERRY; JOSHUA N.                CIV-S-04-2701 DFL/PAN
   BERRY, a Minor, by and through
9  his Guardian ad Litem, LAURA A.
   BERRY; and NEIL W. BERRY,
10      Plaintiffs,
                                            MEMORANDUM OF OPINION
11      v.                                       AND ORDER

12
   OSHKOSH TRUCK CORPORATION;
13 MCNEILUS TRUCK AND
   MANUFACTURING, INC.; and DOES 1
14 through 20, Inclusive,
        Defendants.
15

16

17      The surviving heirs of Christopher Berry (collectively

18 "Berry") filed this wrongful death action against McNeilus Truck

19 and Manufacturing.  Berry, a mechanic, was asphyxiated after

20 becoming trapped in a refuse packer while attempting to replace

21 one of its hydraulic cylinders.  Both parties now move for

22 summary judgment.  For the following reasons, the court DENIES

23 both parties' motions as to all design and warning claims but

24 GRANTS McNeilus' motion to establish that Berry's conduct while

25 repairing the packer was negligent as a matter of law.

26

                            1

I.

Christopher Berry began work as a mechanic for Waste Connections in September 2000.  Pl.'s Statement of Undisputed and Disputed Facts ("SUDF")  ¶ 1.  The parties agree that Berry was a highly skilled mechanic trained in OSHA safety requirements, including "lock out/tag out" procedures.  Id. ¶ 2.  Lock out/tag out procedures, commonly used for heavy machinery, involve "de-energizing equipment before performing maintenance in order to remove any source of power that might activate moving parts and cause injury."  Def.'s SUDF ¶ 17.  The procedures typically require workers to shut off a machine's engine, put the machine's keys in a pocket, lock off any battery switches, chock the wheels, and place warning tags on the machine to warn others that it is in lock out mode.  Id.  At the time of the accident, Waste Connections required its employees to comply with lock out/tag out rules in all circumstances.  Pl.'s SUDF ¶ 6.  Federal OSHA standards require lock out/tag out procedures when engaging in "the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees."  29 C.F.R. § 1910.147(a)(1)(I).  California OSHA standards require the procedures when "cleaning, repairing, servicing, setting-up and adjusting . . . machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees."  8 C.C.R. § 3314(a)(1); see also 8 C.C.R.

§ 4355(c)(5).

On September 5 and 6, 2003, Berry attempted to change a cylinder on a McNeilus Century II refuse packer.  Pl.'s SUDF ¶ 12.  The McNeilus Century II is a side-loader refuse truck. Def.'s SUF ¶ 5.  Refuse is dumped into the packer, where a panel extends to compact it.  Id.  The panel, moved by two hydraulic cylinders, extends and retracts across the packer in a movement called the "pack and sweep cycle."  Id.  The cylinders are attached to the packer body and panel by pins, allowing for rotation, and are arranged in the packer body so they cross each other, allowing for nearly complete retraction to the wall of the packer.  Id.  A replacement cylinder weighs roughly 300 pounds and is shipped with its piston completely retracted.  Id. ¶ 7. The replacement cylinder's piston must be extended before it can be bolted to the back of the panel.  Id. ¶ 7.  The piston may be extended before installation by using the packer's own power supply, although other means are available that do not require the packer's power.  Id. ¶ 7.

Jarrod Calder, a twenty year-old driver at Waste Connections, was not trained as a mechanic but agreed to assist Berry with packer maintenance, as he had done over the prior four months.  Pl.'s SUDF ¶ 5.  On September 5, Berry and Calder removed the old cylinder and placed the new cylinder in the packer body.  Id. ¶ 10.  At some point, either on September 5 or 6, the replacement cylinder was connected to the packer's unenergized hydraulic system.  On September 6, Calder and Berry

3

agreed that Berry would enter the packer body on the cylinder side of the packer panel to finish the replacement cylinder's installation using the packer's hydraulic system while Calder would remain outside to operate the packer's controls.  Id. ¶¶ 12-13.

The packer's controls are located in the cab and on the outside of the packer body.  Def.'s SUDF ¶ 5.  To actuate the pack and sweep cycle, an operator presses either the "pack" button inside the cab or the "packer extend" button on the external control panel.  Id.  The packer controls include a "packer retract button," described by the manual as "control[ling] the retraction of the panel."  Smith Decl., Exh. B at 8.  The manual states that to reverse the packer panel's movement, operators should "[d]uring panel extend - depress the retract button" and "[d]uring panel retract - depress the extend button."  Id.  The packer controls also include an "E-stop," or emergency stop button, which immediately shuts off the packer's electric and hydraulic systems.  Pl.'s SUDF ¶ 18.

Berry instructed Calder, on his signal, to press the "packer extend" button to extend the cylinder into position.  Id. ¶ 13.  Berry stood on the cylinder side of the panel, in position to bolt the replacement cylinder into place.  Def.'s SUDF ¶ 32. Calder re-energized the packer and pressed the packer extend button.  Pl.'s SUDF ¶ 13.  The packer panel, rather than extending, immediately retracted towards its home position, trapping Berry.  Def.'s SUDF ¶ 33.  Although the record is not

entirely clear on this point, retraction in these circumstances was according to the design of the packer, which required it to retract when re-energized, overriding the controls.  Calder attempted to use the controls to extend the panel and free Berry but was unable to do so.  Pl.'s Mot. at 12.  Paramedics pronounced Berry dead at the scene from compressional asphyxia.  Def.'s SUDF ¶ 34.

The parties agree that OSHA regulations regarding confined spaces required Berry to follow lock out/tag out procedures when working in the packer body.  Pl.'s SUDF ¶¶ 28-29.  Moreover, they agree that the packer and its manual included numerous warnings instructing those engaged in "any work" on the packer to abide by lock out/tag out procedures.  Id. ¶¶ 22-24.  It is undisputed that Berry did not comply with these procedures on the day of the accident.  Id. ¶ 28.  The parties agree that the accident would not have occurred if Berry had complied with lock out/tag out procedures.  Id. ¶ 31.

Berry seeks recovery based upon strict liability design defect, negligent design, strict liability warning defect, and negligent failure-to-warn causes of action.  McNeilus disputes all alleged theories of liability and argues that Berry's actions were per se negligent.  The arguments are addressed in sequence below.

## II. Design Defect

California law recognizes two theories under which a plaintiff may demonstrate a design defect.  Under the consumer

expectations test, a product is defective "if the plaintiff shows that the product failed to perform as safely as an ordinary consumer would expect when using the product in an intended or reasonably foreseeable manner." Karlsson v. Ford Motor Co., 140 Cal. App. 4th 1202, 1208 (2006). Under the risk-benefit test, a plaintiff seeking to demonstrate a defect must "balance the risk of danger inherent in the challenged design versus the feasibility of a safer design, the gravity of the danger, and the adverse consequences to the product of a safer design." Id. Berry raises arguments under both defect theories.

A. Consumer Expectations Test

"[T]he consumer expectations test is properly applied in cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design." Jones v. John Crane, Inc., 132 Cal. App. 4th 990, 1001 (2005). The test, however, should not be used in cases in which "a complex product . . . cause[s] injury in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance." Soule v. General Motors Corp., 8 Cal. 4th 548, 566-67 (1994); see e.g. Bates v. John Deere Co., 148 Cal. App. 3d 40, 52 (1983) (refusing to apply consumer expectations test to design of a commercial cotton picker). In Soule, the California Supreme Court rejected application of the consumer expectations test when "ordinary experience and understanding" would not

6

inform "a consumer how safely an automobile's design should perform under the esoteric circumstances of the collision at issue here." 8 Cal. 4th at 570. Rather, the court held that "expert testimony was necessary to illuminate these matters" and applied the risk-benefit test. Id.

The consumer expectations test is similarly inapplicable to Berry's accident. The accident occurred under unusual, uncommon circumstances. Since "[t]he refuse packer spends about 99% of its time on routes versus 1% of its time in the maintenance shop," Pl.'s SUDF ¶ 21, a refuse packer consumer's ordinary experience is unlikely to extend to maintenance and repair matters such as those encountered by Berry. See Barker v. Lull Eng'g Co., 20 Cal. 3d 413, 430 (1978) ("[I]n many situations . . . the consumer would not know what to expect, because he would have no idea how safe the product could be made." (citation omitted)). As in Soule, "[p]laintiff's theory of design defect was one of technical and mechanical detail" and "sought to examine the precise behavior of several obscure components . . . under the complex circumstances of a particular accident." 8 Cal. 4th at 570. The court, therefore, considers Berry's design defect claim only under the risk-benefit test.

B. Risk-Benefit Test

The risk-benefit test allocates the burden of proof between plaintiffs and defendants. "[O]nce the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the

defendant to prove, in light of the relevant factors, that the product is not defective." Barker, 20 Cal. 3d at 431. The relevant factors for determining whether a product is defective include "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." Id. A factfinder also may consider product warnings, but the presence or absence of a warning is not dispositive in finding liability. See Hansen v. Sunnyside Prods., Inc., 55 Cal. App. 4th 1497, 1516-17 (1997) (distinguishing the role of warnings in risk-benefit design defect claims from their role in failure to warn strict liability claims). Finally, when weighing risks and benefits, "the issue of a defective design is to be determined with respect to the product as a whole." Id. at 1513 (citation omitted).

"In the context of products liability actions, the plaintiff must prove that the defective products supplied by the defendant were a substantial factor in bringing about his or her injury." Whiteley v. Philip Morris, Inc., 117 Cal. App. 4th 635, 696 (2004) (citations omitted). "A plaintiff need not establish that a defendant's product was the sole potential proximate cause of injury, but only that the defendant's conduct substantially contributed to the injury and the circumstances make it just to hold the defendant responsible for the consequences of the

accident." <u>Bunch v. Hoffinger Indus. Inc.</u>, 123 Cal. App. 4th
1278, 1302 (2004).  Uncontroverted evidence establishes that (1)
Calder pressed the "packer extend" button, causing the packer
panel to retract and pinning Berry and (2) Calder attempted to
reverse the retraction by using the extend control but he was
unable change the panel's direction.  In both events, the packer
control system substantially contributed to Berry's injury, so as
to establish the packer's design as a proximate cause of the
accident.  Despite such evidence, McNeilus argues that the
packer's design was not a substantial cause of Berry's injury
because he would not have been injured if he had followed lock
out/tag out procedures.  This argument conflates the concepts of
"substantial factor" and "superseding cause."  <u>Soule</u>, 8 Cal. 4th
at 573 n. 9 (stating that superseding cause "absolves a
tortfeasor, even though his conduct was a substantial
contributing factor, when an independent event intervenes in the
chain of causation, producing a harm of a kind and degree so far
beyond the risk the original tortfeasor should have seen that the
law deems it unfair to hold him responsible.").  Even if the
court construes McNeilus' argument to be a superseding cause
defense, summary adjudication of the issue is not appropriate.
Application of the defense requires findings as to the
foreseeability of Berry's method of repair and failure to follow
safety instructions, an issue disputed by the parties and their

experts.[1]   See Def.'s SUDF ¶ 28.

Having established the packer's design as a potential proximate cause of the accident, the court's focus shifts to whether McNeilus has demonstrated that the design's benefits outweigh any alleged risks.   Uncontested facts establish, first, that the control system's design allowed the extend button to trigger a retraction of the panel following re-energization and, second, that the design prevented an operator from using the controls to change the panel's direction once it began to retract.   Pl.'s SUDF ¶ 13; Pl.'s Mot. at 12.   Relying extensively on conflicting expert opinions, however, the parties vigorously contest material facts regarding issues such as user's expectations for the control system's operation, the design's benefits to field operators, and the feasibility of alternative designs allegedly safer for mechanics.   See Def.'s SUDF ¶¶ 19-29. Therefore, the court DENIES both motions for summary judgment as

---

[1] The court denies McNeilus' evidentiary objections to Albert Ferrari's declaration.  The record contains sufficient evidence of Ferrari's qualifications and case-specific research to satisfy Federal Rule of Evidence 702's requirements.  Although Ferrari does not claim to have tested or drawn up plans for his suggested alternate designs, the court finds that he engaged in sufficient research of the accident and inspection of the packer at issue to elevate his opinions beyond conceptualized possibilities.  Ferrari does not claim design experience with refuse packers, but lists extensive experience in applicable areas such as safety engineering, forensic engineering, and machine manufacturing.  He is qualified to render an opinion on potential safety feature additions to the packer mechanism.
The court also denies Berry's Rule 702 objections to statements in the Bartlett and Smith Declarations.  The objections challenge the substance of the declarants' opinions but do not cast sufficient doubt upon the methods used in reaching the conclusions to justify barring the evidence.

to the risk-benefit theory of design defect strict liability.

McNeilus argues that Berry's intentional misuse of the packer made his conduct unforeseeable as a matter of law, precluding a finding of strict design defect liability. See Def.'s Mot. at 13. California law, however, treats an injured party's failure to follow instructions or heed warnings in product defect cases as a matter of comparative negligence rather than a complete bar to recovery, absent additional factual evidence regarding the foreseeability of a product's use. See Daly v. General Motors Corp., 20 Cal. 3d 725, 745-46 (1978). Lock out/tag out procedures aimed to protect users from the danger posed by the alleged design defects: unexpected movement within the packer body. "To the extent the user does elect to use the product with knowledge of the danger posed by the defect, the user's actions are subsumed by comparative negligence. The manufacturer is not relieved of its duty to make a product without defect." Bunch, 123 Cal. App. 4th at 1301. Berry's failure to follow lock out/tag out procedures does not preclude Berry from pursuing a risk-benefit design defect claim.[2]

_____

[2] Authorities cited by McNeilus do not support a complete defense based upon Berry's misuse of the packer. Oakes v. Du Pont de Nemours & Co., 272 Cal. App. 2d 645 (1969), and Martinez v. Nichols Conveyor & Eng'g Co., 243 Cal. App. 2d 795 (1966), were decided before the California Supreme Court applied comparative fault principles to strict liability claims in Daly, 20 Cal. 3d at 742. The only post-Daly case cited by the McNeilus, Schwoerer v. Union Oil Co., 14 Cal. App. 4th 103, 111 (1993), addressed a warning defect, rather than design defect, claim. Moreover, although the Schwoerer court held that the defendant had a right to expect that consumers would follow instructions, it did not hold that failure to do so is a complete bar to recovery, instead choosing to weigh the degree of misuse

Subsequent comparative fault analysis, however, may reduce or eliminate any award based on the defect.  The court need not engage in such comparative fault analysis here since it denies both motions as to design defects.

### III. Negligent Design

Berry alleges a negligent design claim in the complaint, but fails to address the argument specifically in his motion despite moving for summary judgment on all claims.  Although McNeilus' arguments against Berry's negligence theory go unanswered, the court denies both parties' motions as to the claim.  Negligent design, as opposed to strict liability, focuses on "the reasonableness of the manufacturer's conduct" rather than the "condition of the product itself."  Barker, 20 Cal. 3d at 434. McNeilus concedes that William Pat Bartless, the designer of the packer's hydraulic system, was not aware that the panel would retract upon Calder's pressing of the extend button.  Def.'s SUDF ¶ 13.  This concession raises a question as to whether McNeilus failed to take "reasonable precautions in an attempt to design a safe product or otherwise act[] as a reasonably prudent manufacturer would have under the circumstances."  Barker, 20 Cal. 3d at 434.  Neither party presents arguments as to the reasonableness of McNeilus' design conduct.  Therefore, the court cannot decide the reasonableness of McNeilus' design conduct at this stage and DENIES both motions for summary judgment as to the negligent design theory of liability.

against the adequacy of available warnings.  Id. at 112.

12

1

## IV. Warning Defect

2    "The rules of strict liability require a plaintiff to prove

3 only that the defendant did not adequately warn of a particular

4 risk that was known or knowable in light of the generally

5 recognized and prevailing best scientific and medical knowledge

6 available at the time of manufacturing and distribution." <u>Carlin</u>

7 <u>v. Superior Court</u>, 13 Cal. 4th 1104, 1112 (1996); <u>see also</u>

8 <u>Anderson v. Owens-Corning Fiberglas Corp.</u>, 53 Cal. 3d 987, 995

9 (1991).  In determining whether the absence of a warning makes a

10 product defective, California courts consider: "the normal

11 expectations of the consumer as to how a product will perform,

12 degrees of simplicity or complication in its operation or use,

13 the nature and magnitude of the danger to which the user is

14 exposed, the likelihood of injury, and the feasibility and

15 beneficial effect of including a warning." <u>Jackson v. Deft</u>, 223

16 Cal. App. 3d. 1305, 1320 (1990).  California law "does not

17 require the manufacturer to warn against every conceivable health

18 problem associated with use of a product." <u>Schwoerer</u>, 14 Cal.

19 App. 4th at 112.  If the plaintiff used the product contrary to

20 instructions or warnings, "the degree of misuse which will

21 absolve a defendant is inextricably interwoven with the adequacy

22 of the warning provided." <u>Id.</u> at 113.  The adequacy of a warning

23 typically is a factual question for the jury.  <u>Jackson</u>, 223 Cal.

24 App. 3d. at 1320.

25    Although the parties agree that lock out/tag out procedures,

26 if followed, would have prevented Berry's accident, Pl.'s SUDF

¶ 31, material disputes of fact remain regarding the adequacy of McNeilus' warnings.  Berry alleges that there was a known risk of mechanic disobedience with lock out/tag out warnings given the procedures' time-consuming nature.  Def.'s SUDF ¶ 19. McNeilus also knew that packer cylinders needed to be replaced two to four times over a packer's operational life, Pl.'s SUDF  ¶ 34, but failed to provide specific instructions as to how to conduct the maintenance procedure, Def.'s SUDF ¶ 4.  Although specific warnings are not required for every danger associated with a product, these disputes preclude summary judgment as to whether a generalized lock out/tag out warning was adequate for a cylinder replacement procedure.

Moreover, McNeilus fails to establish that no warning was needed regarding the potential retraction of the packer panel following actuation of the "packer extend" button.  Pl.'s Mot. at 15-16.  Berry demonstrates that the hydraulic system's designer was unaware of the feature prior to this action.  Def.'s SUDF ¶ 13.  Factual disputes remain over whether McNeilus should have been aware of the feature and, if so, whether it needed to provide a specific warning.  Furthermore, these issue are inextricably linked to the above questions of design defects, for which the court denies summary judgment.  The adequacy of McNeilus' failure to provide a "packer extend" warning cannot be adjudicated at this stage.

Finally, if McNeilus' warnings are found to be inadequate, the responsibility of weighing Berry's disregard for the warnings

that were given against their potential inadequacy more

appropriately rests with the jury.  See Schwoerer, 14 Cal. App.

4th at 113.  The parties do not dispute that product warnings,

OSHA regulations, and industry practice required lock out/tag out

procedures during packer maintenance and applied to the work

resulting in Berry's death.  Pl.'s SUDF ¶¶ 6, 22-24, 29.  Berry's

disobedience, however, may be mitigated if the lock out/tag out

warnings are found to be inadequate in this situation.

For these reasons, the court DENIES both parties' motions as

to the warning defect strict liability claim.

## V. Negligent Failure-to-Warn

"Negligence law in a failure-to-warn case requires a

plaintiff to prove that a manufacturer or distributor did not

warn of a particular risk for reasons which fell below the

acceptable standard of care, i.e., what a reasonably prudent

manufacturer would have known and warned about."  Carlin, 13 Cal.

4th at 1112.  Following the initial negligence allegations in

Berry's complaint, the parties fail to develop the record

regarding the reasonableness of McNeilus' decision not to provide

more specific warnings.  Since the level of care exercised by

McNeilus remains an open question, summary judgment is

inappropriate.  The court DENIES both parties' motions as to the

negligent failure-to-warn claim.

## VI. Negligence Per Se

McNeilus argues that Berry's undisputed failure to follow

lock out/tag out procedures constituted negligence per se under

Cal-OSHA standards.  Def.'s Mot. at 17-18.  Berry fails to
respond to the argument.  Berry's conduct satisfies the
California requirements for a presumption of negligence per se
due to his violation of Cal-OSHA regulations 8 C.C.R. §§ 3314 and
4355: (1) he failed to follow lock out/tag out procedures during
repairs of a machine that posed a threat of injury in the case of
an unexpected start up, (2) this failure was a proximate cause of
his death, (3) the OSHA regulation was intended to prevent
accidents such as the one that killed him, and (4) Berry was
within the class of individuals that the OSHA regulation aimed to
protect.  See Cal. Evid. Code § 669 (2006) (describing elements
of negligence per se).  McNeilus may use Berry's violation of
§§ 3314 and 4355 to establish Berry's negligence if resolution of
the action requires comparative fault analysis.  See Elner v.
Uveges, 34 Cal. 4th 915, 924 (2004).  Berry could have rebutted
the presumption of negligence established by McNeilus' argument,
but the failure to refute the argument or dispute the facts upon
which it rests constitutes a waiver of any challenge to the
presumption.  Therefore, the court finds that Berry failed to
exercise due care in his repair of the packer, based upon his
violation of §§ 3314 and 4355.

                              VI.

     For the above stated reasons, the court:

     (1) DENIES both parties' motions as to strict liability
design defects;

     (2) DENIES both parties' motions as to negligent design;

                              16

1    (3) DENIES both parties' motion as to strict liability

2    warning defects;

3    (4) DENIES both parties' motions as to negligent failure to

4    warn; and

5    (5) GRANTS McNeilus' motion as to Berry's negligence per se

6    in repairing the packer.[3]

7         IT IS SO ORDERED.

8    Dated: 1/18/2007

9

10

11

12                              DAVID F. LEVI
                                United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24   _____

     [3] Berry alleges warranty claims in the complaint but neither
25   party addresses them in the cross-motions for summary judgment.
     This order, therefore, does not address the warranty claims. The
26   parties shall file a joint statement within 14 days informing the
     court of whether, in light of this order, the warranty claims
     survive or should be dismissed.